UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOSE CALDERON, *et al.*,

                    Plaintiffs,

-v-

919 PROSPECT AVENUE LLC, *et al.*,

                    Defendants.

22-CV-0096 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

Plaintiffs Jose Calderon and Emily Rice initiated this action against Defendants 919 Prospect Avenue LLC, Aegis Realty Management LLC, and Seth Miller, asserting occupancy rights claims as well as race discrimination and other employment claims related to Calderon's employment. Calderon had recently been terminated as superintendent of an apartment building owned by the Defendants. This opinion concerns only the occupancy-related claims stemming from alleged attempts to evict Calderon and Rice from the apartment they resided in pursuant to, and as compensation for, Calderon's job. At this point in the litigation, Plaintiffs claim that Defendants' conduct amounted to (1) harassment under the New York City Housing Maintenance Code, and (2) a private nuisance. Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants move to dismiss the occupancy claims. For the reasons that follow, Defendants' motion is denied.

**I.      Background**

      **A.      Factual Background**

The following facts, drawn from the operative complaint, are assumed true for purposes of this motion.

1

Plaintiffs Jose Calderon and Emily Rice were residents of an apartment at 830 E. 163rd Street, New York, New York (the "Premises"). (ECF No. 24 ("FAC") ¶¶ 10 – 11.) Defendants 919 Prospect Avenue LLC ("919") and/or Aegis Reality Management Corp. ("Aegis") employed Calderon as superintendent of the Premises. (FAC ¶ 10 – 14.) Defendant Seth Miller is a principal in both entities who supervised Calderon's employment. (FAC ¶ 12.) The First Amended Complaint ("FAC") alleges that all three Defendants employed Calderon as the Premises' superintendent, either jointly or as a single employer. (FAC ¶ 13 – 14.) 860 E. 163rd is a six-story, mixed-use building with 37 residential units and commercial units on the ground floor. (FAC ¶ 44.) Plaintiffs allege that Defendants collect at least $61,605 per month, or $739.260 per year, in estimated rent revenue. (*Id.*)

As superintendent, Calderon had primary responsibility for all "maintenance" of the Premises. (FAC ¶ 47.) In that capacity, Calderon performed "a wide range of maintenance work in the building's common areas and for individual tenants," such as "plumbing assignments," "clearing blocked drains," repairing "radiators" and performing other "electrical work," and "provided pest control." (*Id.*) Calderon "further engage[d] in a range of renovation work" as superintendent, ranging from "brickwork, wall framing, sheetrock installation, tiling, pipe fitting, and painting" in addition to being responsible for the "daily cleaning of the building," including "ensuring proper removal of garbage and recycling." (FAC ¶ 48.)

At the start of his employment, Miller provided Calderon with a memorandum stating the following terms: (1) "Calderon would be paid a flat salary of $800 per week"; (2) "Calderon would work Monday to Friday from 8 AM to 5 PM with a one-hour lunch break"; and (3) "Calderon would be on call in case of emergencies 'during waking hours 7 days a week.'" (FAC ¶ 49.) Also as part of his employment, Defendants provided Calderon and his partner Rice with

rent-free lodging in the building, initially in a basement apartment lacking gas and running water, and, starting in September 2020, in Apartment 1B (the "Apartment"); though the Apartment lacked gas and water as well, "Plaintiff himself installed [them]."  (FAC ¶ 50.)  Plaintiffs allege that at no time did any Defendant ask either Rice or Calderon to sign a lease for either unit.  (*Id.*)  Similarly, Plaintiffs allege that Defendants never provided Calderon with "written notice regarding his overtime eligibility," despite Miller's promise "to him that he would be paid overtime for his hours worked over forty each week."  (FAC ¶ 51.)  Additionally, despite the memorandum's terms, Calderon was paid only $760 per week, and no explanation for the missing $40 was ever provided him.  (FAC ¶ 52.)  Plaintiffs allege that Calderon's hours of work regularly vastly exceeded forty hours per week and that Calderon repeatedly informed Defendants of that fact, seeking compensation per the terms of their agreement.  (FAC ¶¶ 53 – 58.)  But no additional compensation for his overtime ever came.  (FAC ¶ 58.)

      The FAC alleges that, during his employment as superintendent, Miller subjected Calderon to racist comments — including referring to Black and Latino people as "lazy pigs." (FAC ¶ 13.)  The FAC further alleges that Calderon suffered mistreatment at work based on his ethnicity.  (FAC ¶ 63.)  Calderon, who identifies as Hispanic, alleges that, in one instance, Miller referred to him as "useless," followed by a slur for people of Hispanic backgrounds.  (FAC ¶ 65.)  The FAC alleges that Miller was unnecessarily harsh, "lambasting" Calderon despite his adequate performance based on Calderon's being Hispanic.  (*Id.*)  This pattern of behavior escalated into Miller making "increasingly frequent threats to fire" Calderon over the course of December 2020 and January 2021.  (FAC ¶ 66.)  Plaintiffs allege that these threats were made in order to "intimidate" Calderon into "not raising the issue of his inadequate pay."  (*Id.*)

On or around January 25, 2021, Miller telephoned Calderon and fired him.  (FAC ¶ 67.)  Calderon alleges that he asked why he had been fired despite the fact "that his job performance had been more than satisfactory," but that Miller "refused to provide reasoning" and "instead respond[ed] to the effect that [he] would 'come up with something'" to explain the termination.  (*Id.*)  Despite the termination, Calderon and Rice continued residing in the Apartment.  (FAC ¶ 70.)

Defendants then filed an eviction suit against Plaintiffs on February 17, 2021.  (*Id.*)  Plaintiffs allege, however, that Defendants used illegal means, principally harassment, to expedite their departure.  First, Plaintiffs allege that around the same time of the termination, Monte Shinn ("Shinn"), an individual employed as a porter by Defendants, threatened Calderon "with a firearm in the hallway [of the Premises] outside Plaintiffs' apartment."  (FAC ¶ 73.)  Shinn explained that "'Seth [Miller] said you were talking shit about me.'"  (*Id.*)  Plaintiffs further allege that they informed both the police and Miller about the incident; the police arrested Shinn, but Miller permitted him to continue working in the building, making Plaintiffs "feel unsafe in their home and fearful of further attack."  (FAC ¶ 74.)

Second, Plaintiffs allege that Defendants harassed them by filing "frivolous police reports against Plaintiff Calderon, falsely alleging that he was vandalizing the building" despite Defendants knowing the reports to be false.  (FAC ¶¶ 75 – 76, 78.)  Plaintiffs allege that these false reports to the police placed them in significant fear of either summary eviction by the police or Calderon's imminent arrest.  (FAC ¶ 129.)

Third, Plaintiffs allege that Defendants sought to make the Apartment unlivable.  They allege that Defendants "shut off electricity in Plaintiffs' apartment for approximately five days," despite repeated reports of the outage to Defendants as well as to the New York City Housing

4

Preservation & Development ("HPD") and the New York City Department of Buildings ("DOB").  (FAC ¶ 77.)  Because Defendants still did not take action to restore their power, Plaintiffs ran an extension cord from the main hallway to power the Apartment.  (*Id.*)  This caused Defendants to file yet another police report.  (FAC ¶ 78.)  As a result of this incident, (1) the responding NYPD officer instructed Calderon to remove the extension cord but did not arrest him, (2) the responding officer warned Miller about unlawfully entering the Apartment, and (3) DOB issued a violation and assessed a fine against Defendants for the power outage and use of an extension cord.  (FAC ¶¶ 77 – 78.)  Plaintiffs allege that, because it was during the winter, the lack of power for four days made "living in the unit hazardous to Plaintiff[s'] health due to the cold temperature."  (FAC ¶ 80.)  In July 2021, the Apartment's ceiling began to have serious issues with leaks, which Defendants refused to repair.  (FAC ¶ 80.)  Finally, "Plaintiffs' apartment . . . became infested with vermin."  (FAC ¶ 82.)  By at least August 2021, Plaintiffs regularly faced large rats in their unit, and Calderon "reported the rat problem to Defendants, who took no corrective action."  (*Id.*)

  **B.**  **Procedural History**

  Plaintiffs initiated this action by filing a Complaint on January 5, 2022.  (*See generally* ECF No. 1.)  That Complaint raised seven causes of action against Defendants jointly and severally: (1) a claim for unpaid overtime under the Federal Labor Standards Act ("FLSA"); (2) a parallel overtime claim under the New York Labor Law ("NYLL"); (3) a claim for unpaid wages under the NYLL; (4) a failure to provide notice claim under the NYLL; (5) a claim for racially discriminatory firing in violation of New York City Human Rights Law ("NYCHLR"); (6) a claim for unlawful termination on the basis of race under the NYCHRL; and (7) a claim for harassment of a lawful occupant under the New York City Housing Maintenance Code.  (ECF No. 1 ¶¶ 83 – 84, 88 – 89, 94 – 95, 100 – 101, 110 – 111.)  The first six causes of action were

brought only on behalf of Calderon, as they concern his employment.  The seventh cause of action, for harassment under the Housing Maintenance Code, N.Y.C. Admin. § 27-2005(d), was brought on behalf of both Plaintiffs.

Defendants filed an Answer on August 10, 2022.[1]  (*See generally* ECF No. 20.) Plaintiffs then filed the First Amended Complaint on August 29, 2022, which restated claims (1) through (7) above without substantial alteration, while adding (8) a claim for private nuisance on behalf of both Rice and Calderon, and (9) a claim for intentional infliction of emotional district ("IIED") on behalf of both Rice and Calderon.  (FAC ¶¶ 123 – 24, 128 – 29.)  Pursuant to a privately negotiated agreement, Plaintiffs agreed to voluntarily vacate the Apartment on December 22, 2022.

On November 14, 2022, Defendants moved to dismiss the three claims filed on behalf of both Rice and Calderon under Federal Rule of Civil Procedure 12(b)(6) — those for violation of the HMC harassment, private nuisance, and IIED — without presently moving with regard to the other six claims, which all concern the conditions of Calderon's employment and discharge. (ECF No. 30 ("Def. Memo") at 1.)  Plaintiffs filed their opposition on December 12, 2022.  (ECF No. 34 ("Opp.") at 1.)  Defendants opted not to file a reply.  On August 17, 2023, the parties, by joint letter motion, informed the Court of Plaintiffs' voluntary dismissal of their IIED claim and any related damages claim above "garden variety" emotional and mental anguish.  (ECF No. 77 at 1.)  The Court approved the dismissal on August 18, 2023.  (ECF No. 78.)

---

[1] The Court granted the Defendants several extensions to respond to the Complaint on consent of Plaintiffs' counsel.  (ECF Nos. 17, 19.)

**II.     Legal Standard**

To survive a Rule 12(b)(6) motion, a plaintiff must show that the complaint alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Complaints have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A court should dismiss a complaint where "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  Courts must accept all allegations and draw all inferences for the plaintiff while generally limiting itself to the face of the complaint.  *See Steginsky v. Xcelera Inc.*, 741 F.3 365, 368 (2d Cir. 2014).

**III.    Discussion**

The Court first addresses Defendants' arguments for dismissal of the HMC harassment claim.  Next, the Court considers Defendants' arguments concerning the private nuisance claim.

**A.     Housing Maintenance Code Harassment**

The New York City Housing Maintenance Code (the "HMC" or the "Code") provides that the owner of a multiple dwelling "shall not harass any tenants *or persons lawfully entitled to occupancy* of such dwelling."  N.Y.C. Admin. Code § 27-2005(d) (emphasis added).  For the purposes of this motion, Defendants do not contest that their alleged actions would amount to "harassment" under the HMC.  Rather, Defendants exclusively argue that the allegations of harassment fail because, even if true, at the time the harassment occurred, Calderon had been terminated as superintendent and, therefore, neither Rice nor Calderon were "persons lawfully entitled to occupancy" of the Apartment.  (Def. Memo at 4.)  Instead, Defendants argue, at the moment Miller discharged Calderon over the phone on January 25, 2021, Rice and Calderon became "squatter[s] who [are] not lawful tenant[s] or occupant[s] of [the] dwelling" who thus did

7

"not have standing to enforce the Housing Maintenance Code against the owner of the dwelling." (Def. Memo at 4 (citing *Valentin v. Dep't of Hous. Pres. & Dev.*, 160 Misc. 2d 418, 420 (N.Y. Civ. Ct., Bronx Cnty. March 4, 1994).)

Plaintiffs do not contest that, since they did not have a lease, they were not "tenants" within the meaning of the Code. They argue, instead, that because they initially possessed the Apartment with Defendants' consent pursuant to Calderon's employment, and they had not yet been lawfully evicted, they were still "persons lawfully entitled to occupancy" of the Apartment withstanding to sue for HMC harassment. (Opp. 8 – 9.) If Calderon's status as recently terminated building superintendent falls into the class of persons lawfully entitled to occupancy during the time prior to their voluntary vacation of the Apartment, then this claim turns on construing "persons lawfully entitled to occupancy." If so, then Rice and Calderon state a claim entitling them to demand compensatory damages, punitive damages, and attorney's fees. N.Y.C. Admin. Code §§ 27-2115(h), (m), (o); *id.* § 27-2120(b).

"Lawful occupancy . . . establishes standing to commence . . . a harassment proceeding" under the HMC. *Allen v. 219 24th St. LLC*, 67 Misc. 3d 1212[A], 2020 WL 2230552, at *1 (Civ. Ct. N.Y. Cnty. May 6, 2020) (citations omitted). New York courts have held that a current superintendent lacking a lease is not a tenant but is still "lawfully entitled to occupancy" for the purposes of HMC standing. *Id.*; *id.* at *4 (collecting cases). However, it is axiomatic that a "squatter who enters the premises without legal permission or authority" lacks such standing. *Valentin*, 160 Misc. at 420 – 21. The question here, then, is whether a recently terminated superintendent, compensated in part by free occupancy in a dwelling, is a legally entitled occupant under New York law. Defendants contend that because Calderon had been fired, he

was no longer occupying the Apartment with "permission" and therefore lacks standing to pursue a harassment claim.

In a thorough, recent opinion dealing with this issue, New York City Civil Judge Heela D. Capell disagreed with Defendants, holding that legal occupation for an invited superintendent extends to the point of actual eviction or vacation by the superintendent. In *Lendor v. Moussavi*, as here, a recently fired superintendent brought a harassment claim against his former employer. 72 Misc. 3d 1220(A), 2021 WL 3779903, at *5 (Civ. Ct. Kings Cnty. Aug. 23, 2021). Like Calderon, the superintendent in *Lendor* continued to reside in an apartment he first occupied pursuant to his (now-terminated) employment agreement with the landlord, and he alleged a similar course of harassment pending legal eviction proceedings as Plaintiffs do in this case. *Id.* at *2 – 3 (alleging harassment by neglect of key utilities, building disrepair, infestation, intimidation, threatened discharge, and other similar events). When the *Lendor* defendants sought dismissal based on the argument that the former superintendent did "not have standing . . . because he has been terminated from his position as superintendent and is occupying the Premises without permission," Judge Capell rejected their interpretation of the Code. *Id.* at *5.

Instead, the court held that the mere "fact that [a plaintiff] is no longer employed as the 'superintendent' . . . at the Building does not render him an unlawful occupant of the premises per N.Y.C. Admin. Code § 27-2004(a)." *Id.* In reaching that conclusion, the court explained that, in similar situations, "the issuance of a warrant of eviction severed the landlord-tenant relationship, yet the [New York] court held [the plaintiff] was lawfully occupying" the dwelling because he had not yet been *actually evicted*. *Id.* (quoting *Shapiro v. Townan Rlty. Co.*, 162 Misc. 2d 630, 631 – 32 (Civ. Ct. N.Y. Cnty. Aug. 10, 1994)). On this rationale, the fact that Calderon was no longer employed as his building's superintendent did not extinguish his and

Rice's occupancy interests in the Apartment and "did not render [them] unlawful occupants" under the Code. *Id.* *5.

The *Lendor* court explained that a narrow construction of the Code excluding discharged superintendents in actual possession of dwellings would be contrary to legislative intent. Relying on case law, the court noted that "[t]he legislative intent in enacting the Housing Maintenance Code was to provide . . . safe housing," which requires a judicial presumption in favor of standing where the complaint deals with matters "which directly impact[] health and safety of occupants of buildings covered by the Building Code and Housing Maintenance Code." *Id.* (quoting *Torres v. New York City Hous. Auth.*, H.P. Index. No. 000677/20, slip op. at *5 (Civ. Ct. N.Y. Cnty. Oct. 8, 2020); citing *Various Tenants of 515 E. 12th St. v. 515 E. 12th St.*, 128 Misc.2d 235, 236 (Civ. Ct. N.Y. Cnty. May 20, 1985)). Here, as in *Lendor*, matters such as vermin infestation and lack of access to heat impact the health and safety of New York City occupants. The Court concludes that a New York court would construe the Code to be inclusive of Calderon and Rice.

The *Lendor* court cited two additional factors specific to its facts, both of which are also present here. First, the court noted that because the complainant was, at least initially, "'lawfully' in possession . . . prior to the . . . termination of his employment," it could not legally follow that he was a squatter, or one who unlawfully entered and then occupied a premises. *Id.* at *5 – 6. Second, the court emphasized that the *Lendor* landlord, like the Defendants here, had long-term actual knowledge of occupancy pursuant to an employment agreement and, prior to termination, had never attempted lawfully to remove a former superintendent. *Id.* at *4 – 5.

None of Defendants' cases support a contrary conclusion. *GSV Properties LLC v. Cepeda*, 47 Misc. 3d 145(A), 16 N.Y.S.3d 792 (1st Dep't 2015), the principal case on which

10

Defendants rely, is a one-paragraph, non-precedential per curiam order affirming a landlord's possessory right in an apartment upon the superintendent's termination. *Id.* Especially since *Lendor* is more recent and better reasoned, *Cepeda* does not control. In any event, *Cepeda* is distinguishable because it did not concern the same legal issue. That case (and the cases it cites) involved a "holdover proceeding"; it did not address who was "lawfully entitled to occupancy" for purposes of the Housing Maintenance Code. The HMC refers to a legal entitlement to occupancy, which New York courts interpret to broadly encompass a variety of possessory property interests, not merely tenancy or ownership. The termination of Plaintiffs' occupancy rights meant that Defendants were entitled to seek to remove them through the applicable lawful process. It does not follow that it also entitles Defendants to harass actual occupants via private retribution while their eviction claim worked its way through housing court.

Construing the allegations in Plaintiffs' favor, as it must at this stage, the Court concludes that Plaintiffs were "lawfully entitled to occupancy" for purposes of the HMC, and thus have statutory standing to assert their claims under that statute.

### B.     Private Nuisance

Under New York law, private nuisance liability lies where a defendant intentionally creates a substantial and unreasonable interference affecting another's right to use and enjoy property, whether through action or omission. *See Bronxmeyer v. United Cap. Corp.*, 79 A.D. 3d 780, 782 – 83 (2d Dep't 2010) (internal citation omitted). It is well established that a private nuisance plaintiff need not plead interference with a property interest as substantial as ownership or tenancy rights, but must minimally plead "some legal interest, as lessee or otherwise, in land." *Kavanagh v. Barber*, 131 N.Y. 211, 214 (1892).

Defendants do not challenge the allegations that their alleged interferences was intentional, substantial to Plaintiffs, or unreasonable in nature. Instead, Defendants repeat their

argument that Plaintiffs fail to allege that they had any property interest in the Apartment. (Def. Memo at 6.)

This argument also fails in the context of Plaintiffs' private nuisance claim. Plaintiffs had an actual possessory interest in the Apartment at the time of the complained-of nuisances. This type of possessory interest is sufficient under New York law for Plaintiffs to have a right to the use and enjoyment of their apartment which they may seek to protect through an action for private nuisance. *See Lendor*, 2021 WL 3779903 at *7 (holding that "[a]bsent a warrant of eviction, a licensee, tenant or subtenant may bring a proceeding" to protect that property interest); *cf. Shapiro*, 16 Misc. 2d at 631 – 32 (holding that actual occupant with severed landlord-tenant relationship could bring action to protect occupancy interest from unreasonable interference). Again, Plaintiffs' allegations must be assumed true at this stage. The Court concludes that the First Amended Complaint plausibly states a claim for nuisance under New York law.

### IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss certain counts of the First Amended Complaint is DENIED. Defendants shall file an answer to the remaining claims of the First Amended Complaint within 21 days after the date of this opinion and order.

The Clerk of Court is respectfully directed to close the motion at ECF Number 30.

SO ORDERED.

Dated: August 21, 2023
       New York, New York

_____
J. PAUL OETKEN
United States District Judge